UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOSEPH JONES,

                              Plaintiff,

              -against-

PEPSICO, INC., LONG TERM DISABILITY
PROGRAM, et al.,

                              Defendants.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 5/6/2016

15-CV-01426 (SN)

OPINION AND ORDER

SARAH NETBURN, United States Magistrate Judge.

        Under the Employee Retirement Income Security Act of 1974 ("ERISA"), Joseph Jones

challenges Pepsico, Inc., Long Term Disability Program's ("LTD Program") denial of his

disability claim. Jones, a former truck driver, suffers from chronic, unexplained, and

unpredictable syncope, or sudden loss of consciousness. The LTD Program determined that

Jones's condition did not leave him completely disabled because he could still do sedentary

office work. According to Jones, the denial was arbitrary and capricious because the plan

administrator had a conflict of interest, disregarded evidence favorable to him, failed to conduct

an independent medical review, and erred when it initially included the occupation phlebotomist

in its vocational analysis. The parties cross-move for summary judgment.

        The defendants' motion for summary judgment is granted, and the plaintiff's motion is

denied. The record shows that Jones has a very serious impairment, one that may place lifelong

limitations on his daily living. But Jones has not established that the independent, third-party

claims administrator had a conflict of interest or that the denial of his claim was arbitrary and

capricious. Thus, under ERISA's highly deferential standard of review, the Court cannot revisit the final claim determination.

## BACKGROUND

The LTD Program is an "employee welfare benefit plan" within the meaning of ERISA. 29 U.S.C. § 1002(1). Benefits under the LTD Program are funded through contributions made to a trust by PepsiCo and program participants. (In some circumstances not relevant here, PepsiCo pays benefits directly.) Sedgwick Claims Management Services administers claims against the LTD Program. Sedgwick has full discretionary authority to determine claims, allocate benefits, and interpret the LTD Plan's provisions. The LTD Program pays Sedgwick a flat rate based on the number of program participants, and that rate does not vary whether Sedgwick approves or denies claims. Sedgwick pays no benefits from its own funds.

Participants have three periods of disability benefits eligibility. At the outset, a participant can receive short-term disability benefits for six months. A participant can continue to collect benefits for 18 months under the LTD Program if he can show that a disability prevents him from performing the material and essential duties of his "Own Occupation." LTD Plan at § 2.48 (Administrative Record ("AR") at 27). Following the Own Occupation period, a participant can collect benefits only if he shows that he cannot engage in any "Reasonable Occupation," defined as "any employment" that provides "a level of pay that is at least 50% of the Participant's Eligible Pay" and for which the participant is qualified by education, training, and experience and which exists within a reasonable geographic area. AR at 23-24, 27-28.

Starting in April 2010, Jones participated in the LTD Program as a Frito-Lay employee. He worked as a Route Sales Representative, which required him to drive a truck. He had a high

school education, one-year of post-high school education, and prior work experience as a sales

representative, merchandiser, personal fitness trainer, waiter, and jewelry salesperson.

Jones suffered from episodes of sudden, periodic, and unpredictable syncope, or loss of

consciousness. In March 2012, he blacked out at work and was hospitalized. Jones sought care

from Dr. Susan Nasser, a family practitioner, and Dr. Ranjiv Choudhary, a cardiac specialist.

Neither physician could diagnose the cause of Jones's syncope, but Dr. Choudhary was able to

rule out arrhythmia. Physician notes indicate that he lost consciousness at least five times

between May 22 and July 18, 2012. Dr. Nasser certified that he would be unable to return to his

job because of his syncope. AR at 411.

Jones applied for short-term disability benefits, and Sedgwick approved his application.

Sedgwick concluded that Jones was unable to return to work because he had syncope, weakness,

right hand tremor, right ankle swelling, and could not drive. AR at 483. Sedgwick approved

Jones's claim through September 15, 2012, the maximum period for short-term benefits. Jones

then applied for long-term benefits, and Sedgwick approved his claim through March 10, 2014,

the end of the Own Occupation period.

During this period, Jones supplied regular updates from his treating physicians. Dr.

Choudhary personally witnessed "recurrent episodes of loss of tone/consciousness." AR at 602.

He diagnosed post-traumatic stress disorder as the cause of Jones's syncope and referred him for

biofeedback therapy. AR at 604. Biofeedback showed some success. In March 2013, Dr.

Choudhary noted: "No episodes of syncope since biofeedback for the last one and half months."

AR at 611. But syncopal episodes would later recur. Dr. Richard Allen opined that Jones was

"not allowed to work in any place due to [syncopal] episodes. It is not safe." AR at 2798. Dr.

Allen and nurse practitioner Jenet Langjahr certified that Jones "unable to work" and "must be

monitored at all times." AR at 672. They diagnosed "syncopal episodes" caused by post-traumatic stress disorder. Id. Dr. Allen witnessed Jones suffer a syncopal episode in which he hit his head on a chair. AR at 637.

As the Own Occupation period drew to a close, Sedgwick reviewed Jones's file to determine whether he was entitled to continued LTD benefits under the more exacting Reasonable Occupation standard. Sedgwick enlisted cardiac electrophysiologist Louis Janeira, who opined that Jones could not drive or engage in other "activities where syncope could be harmful." AR at 1133. But he concluded that Jones could "work at a sedentary desk job" because he could sit and walk for 8 hours and lift, carry, push, and pull up to 25 pounds. Id. Dr. Janeira believed that Jones's condition could be treated through proper hydration and that he would eventually be able to manage his symptoms. Until then, Dr. Janeira concluded, "he is unable to engage in activities that may jeopardize him in case of syncope, which is likely to continue and happen unpredictably." Id. Dr. Janeira's findings were consistent with Dr. Choudhary's physical capacity evaluation, which concluded that Jones could walk and sit for 6 hours each work day, stand for 2 hours, and lift up to 70 pounds frequently. Id. at 541.

Sedgwick ended Jones's LTD benefits effective March 11, 2014, the end of the Own Occupation period. Sedgwick concluded that Jones could do "Sedentary to Light work," and, based on his eligible pay, functional limitations, education, and experience, he could find work within the geographic area as a phlebotomist, customer service representative, television cable service sales representative, or dispatcher. AR at 551-52. Accordingly, he was not totally disabled and was no longer entitled to LTD benefits.

 In a letter written by his wife, Jones appealed the denial of benefits. Ms. Jones asserted that he "is not allowed to drive" that he "cannot be left alone, take care of our daughter, or

shower by himself without supervision." AR at 536. She claimed that "he has placed himself in danger when he has [passed] out in the bath and almost drowned" and that "he has placed our daughter in [harm's] way 3 times by almost landing on her." <u>Id.</u> He was once "taken to the emergency room with a concussion." <u>Id.</u> Dr. Choudhary provided an "Addendum" to his earlier physical capacity evaluation, which concluded: "On further review of his condition and the frequent spells of syncope," Jones "cannot work at all." <u>Id.</u> at 542.

Sedgwick consulted a new set of experts to assess Jones's functional capacity.

Dr. Beverly Yamour, a cardiovascular specialist, reviewed Jones's medical records, spoke to Dr. Choudhary, and opined that Jones had no cardiovascular disorder that would prevent him from working. She wrote:

> While the claimant's condition and diagnosis of syncope would be expected to impact functioning, restrictions and limitations are not supported from a cardiovascular viewpoint, as there is no cardiac etiology of syncope. From March 2014 and ongoing, he still continues to be symptomatic from Dr. Choudhary's observations This is based on the noncardiac diagnosis. There is no evidence of abnormal rhythm, abnormal murmurs, or evidence of impaired left ventricular function. Restrictions and limitations would be deferred to internal medicine and psychiatry.

AR at 1388. After filing her initial report, Dr. Yamour had a teleconference with Dr. Choudhary. Following that conference, Dr. Yamour filed a supplemental report in which she confirmed and elaborated her original opinion:

> [F]rom a cardiovascular viewpoint, the medical evidence does not support a cardiac etiology for the syncopal episodes . . . . His symptoms of lightheadedness are improved with breathing into a paper bag. There has been normal sinus rhythm on Holter monitoring of him when he has been symptomatic. The treating cardiologist does not have evidence that he suffers from an arrhythmia to be the cause of his symptoms.

AR at 1352. Dr. Yamour reiterated that "restrictions and limitations are not supported from a cardiovascular viewpoint, as there is no cardiac etiology of syncope evidenced in the medical data provided." Id.

Dr. Heather Hardison, a clinical psychologist, addressed the possibility that Jones suffered a disabling psychological impairment. After reviewing the medical records, she detected no psychiatric basis for a finding of disability. She wrote:

> There is not sufficient objective evidence to support any work restrictions or limitations beginning 03/11/14 based on any psychological issues. [Jones's] main issues appear to be neurologically/physically based. He has a long history of syncope/passing out over the past few years. It is documented throughout the medical record that he cannot work machines due to the possibility that he would have a seizure and pass out on the job, which is dangerous.

AR at 1396. She concluded that "there are not sufficient objective clinical findings in the medical record to support a psychiatric diagnosis/disability that require any restrictions or limitations . . . ." Id.

Dr. William Mazzella, an internal medicine specialist, opined that Jones would be able to work a sedentary job. He wrote:

> The claimant has medically unexplained syncopal events that have been attributed to PTSD. The clinical documentation has not found any other positive findings from diagnostic testing that would reasonably explain these reported syncopal events. The claimant would reasonably require restrictions from any driving, climbing ladders, working with any type of machinery, or lifting/carrying objects above 10 lbs at any frequency. The claimant should be limited to standing and walking no more than 30 minutes at a time and no longer than 3 hours in an 8-hour period total.

AR at 1400. Dr. Mazzella concluded that, based on his opinion, Jones "could reasonably work at a sedentary office position with the above restrictions. The main purpose of the recommended restrictions is to protect the claimant from injury if he experienced a syncopal event." Id.

Sedgwick asked Meyers Vocational Consulting to conduct a transferable skills analysis to determine whether there were sedentary occupations in Jones's geographic area that paid at least 50% of his eligible pay and that his training, education, and experience qualified him to perform. Meyers concluded that Jones could work as a customer service representative, inside sales representative, and route dispatcher. AR at 1358. Jones neither contested this opinion nor submitted any contrary vocational evidence.

On July 7, 2014, Sedgwick denied Jones's appeal. The denial letter described in detail the findings of Sedgwick's medical, psychological, and vocational experts and concluded that the "medical information in the file does not support your inability to perform Any Occupation," as defined by the Plan. AR at 1344. Jones sought review in this proceeding.

Jones and the LTD Program now cross-move for summary judgment. Jones argues that Sedgwick denied his claims because of a conflict of interest, that Sedgwick unreasonably cherry-picked favorable evidence and deemphasized evidence supporting a disability finding, that the vocational analysis was arbitrary and capricious, and that Sedgwick erred by conducting a paper review. Jones asks the Court to award benefits without remanding the matter to Sedgwick. The LTD Program argues that the denial was not arbitrary and capricious because it was well-supported by record evidence.

## DISCUSSION

### I.    Standards of Review

#### A.    Summary Judgment

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden rests on the moving party to show that there is no genuine issue of

material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks and citations omitted). The Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**B.     ERISA**

ERISA provides a cause of action to challenge a denial of benefits. See 29 U.S.C. § 1132(a)(1)(B). A denial should "be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When the plan confers discretionary authority, the Court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation marks omitted). A conclusion is arbitrary and capricious when it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (internal quotation marks omitted).

The parties agree that the LTD Plan gave its administrator discretion to determine benefits eligibility and construe the Plan's terms. Accordingly, the Court will review the denial of Jones's benefit under the highly deferential arbitrary and capricious standard.

## II.    Conflict of Interest

Jones argues that the denial should be set aside because Sedgwick had a conflict of interest. According to Jones, Sedgwick had an incentive to deny claims against the LTD Program because of the large volume of business it does with PepsiCo.

A conflict of interest is something a court "must take into account and weigh as a factor in determining whether there was an abuse of discretion," but it "does not make *de novo* review appropriate." McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 133 (2d Cir. 2008). An employer who pays its own benefits claims and administers its own plan has a conflict of interest because "every dollar provided in benefits is a dollar spent by the employer." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008) (internal quotation marks and alteration omitted). But a third-party administrator can also have a conflict of interest. When a "plan administrator both evaluates claims for benefits and pays benefits claims," then the administrator is conflicted. Id. Once an employee has shown a conflict of interest, the court must determine "how heavily to weight" the conflict, "considering such circumstances as whether procedural safeguards are in place that abate the risk, perhaps to the vanishing point." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 138 (2d Cir. 2010) (internal quotation marks omitted).

Jones has not shown that Sedgwick has a conflict of interest. Jones does not dispute that Sedgwick is an independent, third-party administrator that is not owned or operated by PepsiCo. He also concedes that Sedgwick does not pay benefits from its own funds—benefits come from the trust account, and, in some circumstances from PepsiCo itself. Because Sedgwick does not pay claims out of its own pocket, Jones cannot show a conflict of interest under Glenn. Instead, he argues that Sedgwick has a conflict of interest because it has a financial incentive to keep PepsiCo happy—and its contracts intact—by denying claims. But that logic would apply to any

third-party administrator and make it virtually impossible to administer an ERISA plan without a conflict of interest. See Tortora v. SBC Comms., Inc., 739 F. Supp. 2d 427, 439 (S.D.N.Y. 2010). Sedgwick's incentive is not to deny claims but "to provide accurate claims processing, because its professional reputation depends on unbiased results and customer satisfaction." Id. A pattern of denying worthy claims would tarnish that reputation. Without more, Jones cannot show that Sedgwick was conflicted.[1]

Jones relies on Meguerditchian v. Aetna Life Ins. Co., in which the district court concluded that an independent claims administrator had a "strong incentive" to rule in favor of the plan sponsor. 999 F. Supp. 2d 1180, 1186 (C.D. Cal. 2014). The Court does not find Meguerditchian to be persuasive because it is an outlier; the majority of federal courts have found that third-party administrators do not have a conflict of interest.[2] But even Meguerditchian recognized that "evidence in the record" must show that "the potential conflict" actually "motivated or influenced" the administrator's decision to deny benefits. Id. Here, Jones has shown no evidence linking Sedgwick's supposed conflict to its decision to deny his benefits.

---

[1] Following the close of summary judgment briefing, the LTD Program identified Tortora in a letter to the Court as a case that supported its position. See ECF No. 63. Jones argues that LTD should be precluded from relying on Tortora because it did not mention the case earlier in the briefing. See ECF No. 64. The Court is entitled to take judicial notice of published case law and will not ignore persuasive authority simply because a party did not timely cite it.

[2] See, e.g., Tortora, 739 F. Supp. 2d 427; Aschermann v. Aetna Life Ins. Co., 689 F.3d 726, 729-30 (7th Cir. 2012) (The "delegation from Lumbermens to Aetna reduced any potential for conflict. Lumbermens, as an underwriter, benefits when claims are denied . . . . Aetna, as a third-party administrator, has no financial interest: when it grants or continues benefits, Lumbermens pays. Aetna gains from efficient and accurate resolution of claims—and any temptation to cut corners would lead Aetna to grant (or continue) benefits in order to avoid expensive litigation such as this suit."); Day v. AT&T Disability Income Plan, 698 F.3d 1091, 1096 (9th Cir. 2012) ("The district court did not err in finding no inherent or structural conflict of interest. The Plan is funded by AT & T and not Sedgwick, and administered by Sedgwick and not AT & T."); Wellman v. Metlife Ins. Co., 674 F. Supp. 2d 449, 451 (W.D.N.Y. 2009) ("MetLife is the Plan Administer only. The Plan is self-insured, and thus there is no conflict justifying application of a heightened standard of review."); James v. AT&T Disability Benefits Program, 41 F. Supp. 3d 849, 873 (N.D. Cal. 2014) ("Here, the facts show that the plan is self-funded and Sedgwick is the third-party claims administrator. . . . Where the party that must pay the benefits and the party that administers the benefits are not the same, there is little risk, if any of a conflict of interest.").

Jones argues that Sedgwick demonstrated a conflict of interest by denying all claims filed by P Group claimants in January, February, May, April, June, and December of 2010. But the significance of this data is questionable. First, a high rejection rate provides only correlative evidence, not causative evidence, of a conflict of interest. Taken with other evidence of a conflict of interest, a high rejection rate might support Jones's claim, but Jones has provided no such evidence. The Court will not infer a conflict of interest based on six isolated months of denials. Second, Jones selectively chose his figures. The P Group is one of a number of groups in PepsiCo's LTD Program. When all groups are taken into account, Sedgwick *approved* nearly 40% of the total claims filed against the LTD Program. Plainly, Sedgwick did not mechanically reject every claim against the LTD Program, and the high rejection rate in the P Group does not prove that Sedgwick had a conflict of interest.

**III.     Substantial Evidence Review**

Jones argues that Sedgwick "'cherry-picked' favorable evidence and de-emphasized evidence supporting disability." Pl.'s Mem. of Law at 16. Essentially, Jones argues, Sedgwick did not fully appreciate the extent of Jones's disability because it ignored evidence that Jones required constant monitoring and could not work without risk of injury.

Because the LTD Program gives Sedgwick discretion, the Court has limited authority to reverse its benefits decisions. The Court must affirm Sedgwick's decision when it is based on "substantial evidence." Pagan, 52 F.3d at 442. Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion" and requires "more than a scintilla but less than a preponderance." Durakovic, 609 F.3d at 141 (internal quotation marks omitted). Further, an ERISA administrator need not "credit the opinions of treating physicians over other evidence relevant to the claimant's condition." Black & Decker Disability Plan v.

Nord, 538 U.S. 822, 825 (2003). "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." McCauley, 551 F.3d at 132 (internal quotation marks omitted). A court is "not free to substitute" its "own judgment for that of the insurer as if" the court "were considering the issue of eligibility anew." Hobson, 574 F.3d at 83-84 (internal quotation marks and brackets omitted). Thus, regardless of the strength of Jones's case, so long as the LTD Program can support its conclusions with substantial evidence, its decision must control.

Jones has shown that he suffers from a serious impairment. His syncope significantly limits his ability to carry out routine activities. He lives in constant worry that he will harm himself or others by suddenly passing out. His treating physicians believe that he needs constant supervision and thus cannot work. Surely, Jones's condition has reduced his quality of life and made it impossible to do the type of work he has done in the past. Jones makes a strong case that he cannot do any type of work. But the Court cannot reverse the claims administrator simply because Jones made a strong case. Instead, the Court can only evaluate whether the denial was supported by substantial evidence.

The denial of Jones's claim was supported by substantial evidence. Four medical experts concluded that Jones was not fully disabled. Each opinion was based on the clinical findings of Jones's physicians and other record evidence. Dr. Janeira found that Jones's syncope prevented him from driving or operating heavy machinery, but concluded that a sedentary desk job was well within his functional capacity. Dr. Janeira's findings were broadly supported by Dr. Choudhary's earlier assessment that Jones could walk and sit for 6 hours each work day, stand for 2 hours, and lift up to 70 pounds frequently. Dr. Yamour found that there was no cardiac

explanation for Jones's condition—a conclusion supported by both Dr. Choudhary and Dr. Allen, who believed that Jones's condition was caused by post-traumatic stress disorder. Because her expertise was cardiac, Dr. Yamour deferred to other experts for a more complete picture of Jones's functional capacity, but opined that no cardiac condition prevented him from working. Dr. Hardison, a psychiatric expert, concluded that no psychiatric diagnosis or disability would prevent Jones from working. She, too, deferred an ultimate conclusion on Jones's functional capacity to other experts. Dr. Mazzella, an internal medicine specialist, echoed Dr. Janeira's findings: Jones could work a sedentary office job as long as he did not stand or walk for more than 30 minutes at a time or more than 3 hours in an 8-hour period. Dr. Mazzella's functional capacity conclusion was consistent with Dr. Choudhary's earlier assessment. In fact, it was more restrictive. Uncontested vocational evidence showed that Jones could work as a customer service representative, inside sales representative, and route dispatcher, each jobs that existed in his region and that paid at least 50% of his eligible salary. Taken together, this evidence supports Sedgwick's decision to deny Jones's claim.

Jones argues that Sedgwick unreasonably discounted evidence that he was at constant risk of injury from his syncope. To the contrary, Sedgwick took full account of the dangers posed by Jones's condition. Sedgwick sustained disability claims under the short-term disability standard and the Own Occupation standard during Jones's entire period of eligibility because Sedgwick concluded that he cannot drive. In its Reasonable Occupation analysis, Sedgwick limited Jones's functional capacity to sedentary office work where he would be at less risk of injury from passing out. These decisions show that Sedgwick was fully aware of Jones's serious impairment. The major point of departure between Sedgwick's conclusions and those of Jones's treating physicians was over the question of whether Jones could work at all. But "courts have no

warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Nord, 538 U.S. at 834. Sedgwick credited the reliable evidence of its own experts over Jones's treating physicians, and the Court has no power to set that decision aside.

Jones argues that Sedgwick erred by conducting a paper review of his medical records rather than ordering an independent medical examination. But it is not arbitrary and capricious for a plan administrator to rely on a paper review, especially where, as here, the reviewing experts accepted the clinical findings of the applicant's treating physicians. To require an independent examination "risks casting doubt upon, and inhibiting, the commonplace practice of doctors arriving at professional opinions after reviewing medical files, which reduces the financial burden of conducting repetitive tests and examinations." Hobson, 574 F.3d at 91 (internal quotation marks omitted). Sedgwick's experts based their functional capacity assessments on the clinical findings in the record. Their assessments differed from Jones's treating physicians' only in their ultimate conclusion that Jones could work. There was no need for a duplicative round of examinations because the experts broadly agreed on the underlying clinical facts.

Finally, Jones argues that Sedgwick's vocational analysis was arbitrary and capricious because Sedgwick originally concluded that Jones could work as a phlebotomist. But a district court reviews only the final claims decision, not preliminary denials. See, e.g., Khoury v. Grp. Health Plan, 615 F.3d 946, 952 (8th Cir. 2010). It makes little sense to hold Sedgwick to an earlier, arguably incorrect, assessment of Jones's condition when Sedgwick abandoned that position in its final analysis. Otherwise, Sedgwick would have no incentive to correct its own

mistakes. Judicial review would thereby usurp the administrator's discretion and undermine ERISA's administrative process. Accordingly, the Court finds that Sedgwick's final vocational analysis was not arbitrary and capricious. On the contrary, Sedgwick's revised decision shows that it reviewed Jones's file with a critical eye instead of simply relying on its first cursory rejection. Jones counters that Sedgwick revised its vocational analysis for the wrong reason. Rather than concluding that Jones's syncope would make it dangerous to draw other people's blood, Sedgwick removed phlebotomist from its analysis only because Jones lacked a necessary certification. But the Court will not scrutinize Sedgwick's motivations for revising its decision. Under ERISA's deferential standard of review, it suffices that Sedgwick did not include the occupation in its final vocational analysis.

## CONCLUSION

The denial of benefits was not arbitrary and capricious. Accordingly, the LTD Program's motion for summary judgment is GRANTED, and Jones's cross-motion is DENIED. The Clerk of Court is directed to enter judgment in favor of the defendants.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:   New York, New York
         May 6, 2016

15